the judgment appealed from be so modified as to accord with the views herein expressed.

The judgment should be reversed and a new trial granted, with costs to abide event, unless within ten days after notice of this decision the plaintiff stipulates that the judgment be modified by deducting the amount of the mortgage and taxes from the amount of the award, before a division is made, and that the provisions of the judgment be readjusted accordingly, and in that event the judgment, as thus modified, should be affirmed, without costs in this court to either party. The order, if not agreed upon by the parties, may be settled before VANN, J., upon a notice of five days.

PARKER, Ch. J., concurs in result; BARTLETT, HAIGHT, MARTIN, CULLEN and WERNER, JJ., concur generally.

Judgment accordingly.

---

BENJAMIN L. M. BATES, Respondent, *v.* FREDERICK HOL-BROOK et al., Appellants.

1. NEW YORK CITY — SUBWAY IMPROVEMENT — OBSTRUCTION OF THOROUGHFARE. The erection in the paved thoroughfare, or plaza, in front of the Everett House, and between it and Union Square in the city of New York, and outside of the line of the subway, and partly in said square, of buildings and structures, inclosing about two-thirds of the thoroughfare for the storage of tools and machinery used in the construction of a section of the subway requiring three or more years to complete, and for the generation of compressed air power for use along the whole line of work on the section, thereby causing serious loss and damage to the proprietor of the hotel, is not authorized by the terms of the Rapid Transit Acts (L. 1892, ch. 556, § 5; L. 1896, ch. 729, § 39).

2. APPROPRIATION NOT A TEMPORARY PRIVILEGE — PERMANENT STRUCTURES. Such buildings and structures, although not permanent in a general sense, are so in a special sense with reference to the completion of the work, and their maintenance is not the enjoyment of temporary privileges within the meaning of section 5 of chapter 556 of the Laws of 1892, prohibiting the use or occupancy of streets except such as may have been designated for the route or routes of a railway or except such temporary privileges as the proper authorities may grant to facilitate construction.

3. Nuisance — Damages.  The erection and maintenance by sub-contractors of such structures, which cause serious loss and damage to a hotel proprietor and which structures could as well be located in sparsely settled districts near the river front or subdivided into a number of small plants along the line of the work, is not necessary for the reasonable prosecution of the work and constitutes a nuisance entitling such proprietor to adequate compensation in damages or to an injunction restraining its continuance.

*Bates* v. *Holbrook*, 67 App. Div. 25, affirmed.

(Argued May 6, 1902;  decided June 10, 1902.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered December 23, 1901, reversing a judgment in favor of defendants entered upon a dismissal of the complaint by the court on trial at Special Term and granting a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*John M. Bowers* and *James A. Dunn* for appellants.  The representatives of the state, empowered by statute to make public improvements in a public street which do not involve direct encroachment upon private property, are not liable for consequential damages, unless such damages are caused by negligence, misconduct or want of skill.  (*Uppington* v. *City of New York*, 165 N. Y. 222 ; *Holland House* v. *Baird*, 169 N. Y. 136 ; *Lester* v. *Mayor, etc.*, 79 Hun, 479 ; 150 N. Y. 578 ; *N. T. Co.* v. *Chicago*, 99 U. S. 635 ; *Atwater* v. *Canandaigua*, 124 N. Y. 602 ; *Benner* v. *A. D. Co.*, 134 N. Y. 156 ; *Radcliff* v. *Mayor, etc.*, 4 N. Y. 195 ; *Bellinger* v. *N. Y. C. R. R. Co.*, 23 N. Y. 42 ; *Brooklyn Park Comm.* v. *Armstrong*, 45 N. Y. 235 ; *Kellinger* v. *F. S. S. R. Co.*, 50 N. Y. 206 ; *Uline* v. *N. Y. C. R. R. Co.*, 101 N. Y. 125 ; *Seifert* v. *City of Brooklyn*, 101 N. Y. 136.)  In cases of authorized nuisances in a highway, the plaintiff must allege and prove negligence in order to recover.  (*Babbage* v. *Powers*, 130 N. Y. 281 ; *Nolan* v. *King*, 97 N. Y. 565 ; *Congreve* v. *Smith*, 18 N. Y. 79 ; *Creed* v. *Hartman*, 29 N. Y. 591 ; *Sexton* v. *Zett*, 44 N. Y. 430 ; *Clifford* v. *Dam*, 81

N. Y. 56; *Urquhart* v. *Ogdensburg*, 91 N. Y. 67; *Port Jervis* v. *F. N. Bank*, 96 N. Y. 556; *Wolf* v. *Kilpatrick*, 101 N. Y. 146; *Seifert* v. *Brooklyn*, 101 N. Y. 143.) The injuries complained of do not constitute a taking or a trespass, and are in all respects what are commonly called consequential injuries. (*Story* v. *El. R. R. Co.*, 90 N. Y. 122; *Lahr* v. *E. R. R. Co.*, 104 N. Y. 288; *Kane* v. *E. R. R. Co.*, 125 N. Y. 176; *Bischoff* v. *E. R. R. Co.*, 138 N. Y. 262; *Sperb* v. *E. R. R. Co.*, 137 N. Y. 158; *Fobes* v. *R., W. & O. R. R. Co.*, 121 N. Y. 505; *A. B. N. Co.* v. *N. Y. E. R. Co.*, 129 N. Y. 271; *Bohm* v. *M. E. R. R. Co.*, 129 N. Y. 587; *I. Ry. Co.* v. *Eberly*, 110 Ind. 542; *Eels* v. *A. T. & T. Co.*, 143 N. Y. 133.) The Appellate Division erred in its construction of the power of the rapid transit railroad commissioners. (*McCullough* v. *Maryland*, 4 Wheat. 414; *Morris* v. *Edgington*, 3 Taunt. 31; *Lawton* v. *Rivers*, 2 McC. 445; *Pettingill* v. *Porter*, 8 Allen, 1; *Marvin* v. *B. I. Co.*, 55 N. Y. 553.) The legislature contemplated in using the word " temporary " a period of time commensurate with the reasonable prosecution of the work. (*Vanderpool* v. *Husson*, 28 Barb. 196; *Plant* v. *L. I. R. R. Co.*, 10 Barb. 26; *Welde* v. *N. Y. & H. R. R. Co.*, 28 App. Div. 385; *Matter of N. Y. C. R. Co.*, 104 N. Y. 19; *Passmore's Case*, 1 S. & R. 217.) The defendants procured all necessary permits from the proper authorities to erect and carry on their plant in Union Square. (*Bradley* v. *Mayor, etc.*, 65 App. Div. 293; *Creed* v. *Hartman*, 29 N. Y. 591; *Jorgenson* v. *Squires*, 144 N. Y. 283; *Babbage* v. *Powers*, 130 N. Y. 281; *Boots* v. *Washburn*, 79 N. Y. 207; *Chicago City* v. *Robbins*, 2 Black, 425; *Robbins* v. *Chicago*, 4 Wall. 679.) The Appellate Division, not having reversed the Special Term upon the facts but upon the law, this court will reverse the judgment of the Appellate Division and affirm that of the Special Term if the facts found support the judgment. (*O. B. Co.* v. *Pearson*, 73 N. Y. Supp. 541; *Metcalf* v. *Moses*, 161 N. Y. 587; *Smith* v. *S. I. Co.*, 161 N. Y. 484; *Wetmore* v. *Wetmore*, 162 N. Y. 503; *Schryer* v. *Fenton*, 162 N. Y. 444; *Spellman* v. *Looschen*,

162 N. Y. 268; *N. H. Co.* v. *Bement,* 163 N. Y. 505; *Spence* v. *Ham,* 163 N. Y. 220; *Van Beuren* v. *Wotherspoon,* 164 N. Y. 368; *Neuman* v. *N. Y. M. Assn.,* 164 N. Y. 248.)

*Charles F. Brown* and *John Delahunty* for respondent. The structures erected by the defendants in connection with their use constituted a nuisance which caused special damage to the plaintiff. The buildings and the use to which they were put would have constituted a nuisance if they had been erected by a private individual upon his own property. (*Campbell* v. *Seaman,* 63 N. Y. 568; *Cogswell* v. *N. Y., N. H. & H. R. R. Co.,* 103 N. Y. 21; *Bohan* v. *P. J. G. L. Co.,* 122 N. Y. 18; *B. & P. R. R. Co.* v. *F. B. Church,* 108 U. S. 317; *Booth* v. *R., W. & O. T. R. R. Co.,* 140 N. Y. 267.) The fact that the defendants were engaged in the construction of a public work does not constitute a defense to this action. (*Cogswell* v. *N. Y., N. H. & H. R. R. Co.,* 103 N. Y. 10; *Bohan* v. *P. J. G. L. Co.,* 122 N. Y. 18; *Hill* v. *Mayor, etc.,* 139 N. Y. 495; *Morton* v. *Mayor, etc.,* 140 N. Y. 211; *U. S.* v. *Fisher,* 2 Cranch, 390; *B. & P. R. R. Co.* v. *F. B. Church,* 108 U. S. 317; *Seifert* v. *City of Brooklyn,* 101 N. Y. 136; *Uline* v. *N. Y. C. R. R. Co.,* 101 N. Y. 125; *Conklin* v. *N. Y., O. & W. R. Co.,* 102 N. Y. 107.) The undisputed facts bring the case within the rule that one who carries on a business in such a manner as to prove a nuisance to his neighbors is liable for damages, and the fact that the acts were done in the performance of work authorized by law is not a protection from liability. (*Comm.* v. *Kidder,* 107 Mass. 188; *Hill* v. *Met. Asylum Dist.,* L. R. [4 Q. B.] 433; *Hill* v. *Mayor, etc.,* 139 N. Y. 495.) The park commissioners had no power under the charter to authorize the erection of the structures complained of. (*Callahan* v. *Gilman,* 107 N. Y. 360; *Cohen* v. *Mayor, etc.,* 113 N. Y. 532; *Speir* v. *City of Brooklyn,* 139 N. Y. 6; *People* v. *Kerr,* 27 N. Y. 188; *Sheehy* v. *Clausen,* 26 Misc. Rep. 269; *Ackerman* v. *True,* 31 Misc. Rep. 598.) There is no provision in

the Rapid Transit Acts which authorizes the erection of the structures complained of. (L. 1892, ch. 556, § 4; L. 1896, ch. 729, § 39; *Story* v. *N. Y. El. R. R. Co.*, 90 N. Y. 122; *Kane* v. *N. Y. El. R. R. Co.*, 125 N. Y. 164; *Halloway* v. *Southmayd*, 139 N. Y. 390; Dillon on Mun. Corp. [4th ed.] 889; *Brown* v. *Manning*, 6 Ohio, 298; *State* v. *Woodward*, 23 Vt. 92; *Pomeroy* v. *Mills*, 3 Vt. 279; *State* v. *Atkinson*, 24 Vt. 448; *Rutherford* v. *Taylor*, 38 Mo. 315.) The plaintiff has no adequate remedy at law. As against such a nuisance as that complained of the courts of equity will afford a remedy by injunction. (*Flynn* v. *Taylor*, 127 N. Y. 596; *Buchholz* v. *N. Y., L. E. & W. R. R. Co.*, 148 N. Y. 640; *Garvey* v. *L. I. R. R. Co.*, 159 N. Y. 323.)

BARTLETT, J. This action is brought by the lessee and proprietor of a hotel known as the "Everett House" in the city of New York, situated on the northwest corner of 17th street and Fourth avenue, against sub-contractors engaged in the construction of a portion of the subway in the city of New York, for an injunction restraining the defendants from maintaining certain buildings which are alleged to constitute a nuisance and to recover damages arising therefrom.

The Special Term dismissed the complaint, the Appellate Division reversed the order and the defendants come here stipulating for judgment absolute in case of affirmance.

The trial judge found, among other facts, that the hotel premises have a frontage of about 128 feet on Union Square and 168 feet on Fourth avenue, are five stories high and contain some 250 rooms, several restaurants, a café and a bar.

That the park known as Union square, as designated by law, extends to the northerly limit of the prolongation of the thoroughfare, which to the westward of Broadway and the eastward of Fourth avenue is known as 17th street.

That so much of the Union Square as is laid out as a park is of oval shape, and so situated that there is in front of the plaintiff's hotel a paved place used as a thoroughfare for vehicles and about 150 feet wide.

and we cannot say that the finding of the referee, that the plaintiff was guilty of no negligence in signing them in the condition in which they were presented for signature, was without sufficient evidence for its support.

We are now brought to the consideration of the finding of the referee that the plaintiffs were not guilty of negligence in failing to discover the forgeries after the return of the checks and the balancing of the account in the pass book. Preliminarily we must determine what duty the depositor owes to his bank by way of examination and verification of his checks and account, for the learned counsel for the respondent asserts that no such duty in reality exists. This contention is principally based on the authority of *Weisser's Admrs.* v. *Denison* (10 N. Y. 68). In that case a depositor sued his bank for the amount of certain checks to which his signature was forged by his clerk. His pass book was balanced and vouchers returned at intervals as in the present case. At the trial he recovered a verdict for the full amount of the forgeries. On appeal the General Term of the Superior Court ordered a reversal of the judgment unless the plaintiff would reduce his recovery to the amount paid on the forged checks prior to the time when the bank book was first balanced and vouchers returned. To this reduction the plaintiff assented, and, on the defendant's appeal, the judgment as modified was affirmed by this court. In the opinions delivered by two distinguished judges the doctrine is asserted that the depositor owes no duty to the bank to examine his pass book or vouchers with the view to the detection of forgeries, but the decision itself is not authority for more than the proposition that the bank was not relieved from liability for forged checks which it had paid before the account was balanced by the failure of the depositor to subsequently discover the forgeries. As was said by Judge JOHNSON as to these checks, " Whatever loss the bank has sustained, it has suffered from its own negligence or want of skill in a matter as to which, in the first instance, it and it only was bound to exercise skill and diligence. To this loss no act of Weisser has contributed." The question again came before

this court in the case of *Frank* v. *Chemical National Bank of New York* (84 N. Y. 209). That action also was brought to recover the amount of a series of checks forged by the depositor's clerk. A recovery by the plaintiffs was upheld, though not on the principle that the depositor owed no duty to his bank, but on the ground that he had discharged that duty. In the opinion there delivered Judge ANDREWS said : " It does not seem to be unreasonable, in view of the course of business and the custom of banks to surrender its vouchers on the periodical writing up of the accounts of depositors, to exact from the latter some attention to the account when it is made up or to hold that the negligent omission of all examination may, when injury has resulted to the bank, which it would not have suffered if such examination had been made and the bank had received timely notice of objections, preclude the depositor from afterward questioning its correctness. But where forged checks have been paid and charged in the account and returned to the depositor, he is under no duty to the bank so to conduct the examination that it will necessarily lead to the discovery of the fraud. If he examines the vouchers personally and is himself deceived by the skillful character of the forgery, his omission to discover it will not shift upon him the loss which in the first instance is the loss of the bank." In that case the depositor compared the returned checks with the stubs in the check book, but was deceived by the fact that the forger had abstracted the forged checks from the package. In the Supreme Court of the United States and in several of our sister states the rule is settled that the depositor owes his bank the duty of a reasonable verification of the returned checks. In *Leather Manufacturers' Bank* v. *Morgan* (117 U. S. 96) it was held that a depositor is bound personally or by his agent, and with due diligence, to examine the pass book and vouchers, and to report to the bank without unreasonable delay any errors which may have been discovered therein, and that if he fails to do so and the bank is thereby misled to its prejudice, he cannot afterwards dispute the correctness of the balance shown in the pass book. In *Dana* v.

*National Bank of the Republic* (132 Mass. 156) the Supreme Court of Massachusetts said: "The mistake was in the payment of the money upon an altered check, believed to be genuine; it was not for the advantage of the defendant, and its condition was changed by it. It was in the course of dealings between the parties in relation to which each owed duties to the other. * * * The plaintiffs (depositors) owed to the defendant (bank) the duty of exercising due diligence to give it information that the payment was unauthorized; and this included not only due diligence in giving notice after knowledge of the forgery, but also due diligence in discovering it." In *Myers* v. *Southwestern National Bank* (193 Penn. St. 1) it was held that the bank was entitled to have the vouchers which it surrendered with the pass book examined and if rejected returned within a reasonable time, and that if this was not done because of the depositor's failure to perform his duty in that regard he should not be permitted to recover. The same rule of law obtains in Louisiana (*De Feriet* v. *Bank of America*, 23 La. Ann. 310), in Texas (*Weinstein* v. *National Bank*, 69 Tex. 38) and in Alabama (*First National Bank* v. *Allen*, 100 Ala. 476). The course of dealings between banks and their depositors is well known and is considered at length in the three cases first cited from other jurisdictions. The methods of depositors in drawing checks on their accounts have become much more uniform than at the time of the decision in *Weisser* v. *Denison* (*supra*). The practice of taking checks from check books and entering on the stubs left in the book the date, amount and name of the payee of the check issued has become general, not only with large commercial houses but with almost all classes of depositors in banks. The skill of the criminal has kept pace with the advance in honest arts and a forgery may be made so skillfully as to deceive not only the bank but the drawer of the check as to the genuineness of his own signature. But when a depositor has in his possession a record of the checks he has given, with dates, payees and amounts, a comparison of the returned checks with that record will necessarily expose for-

geries or alterations. It is true that it will give no informa-
tion as to the genuine character of the indorsements, and
because the depositor has no greater knowledge on that sub-
ject than the bank, it owes the bank no duty in regard thereto.
( *Welsh* v. *German-American Bank,* 73 N. Y. 424; *Shipman*
v. *Bank of the State of New York,* 126 N. Y. 318.) It is
also true that verification of the returned checks would not
prevent a loss by the bank in the case of the payment of a
single forged check and probably not in many cases enable
the bank to obtain a restitution of its lost money. It would,
however, prevent the successful commission of continuous
frauds by exposing the first forgeries. That this is a numer-
ous class of frauds is apparent from the number of cases which
we have cited, in all of which the forgery was not a single act,
but a series of acts extending over a considerable period of
time, and the crime was committed by a clerk or employee of
the depositor. Considering that the only certain test of the
genuineness of the paid check may be the record made by the
depositor of the checks he has issued, it is not too much, in
justice and fairness to the bank, to require of him, when he
has such a record, to exercise reasonable care to verify the
vouchers by that record.

While we hold that this duty rests upon the depositor, we
are not disposed to accept the doctrine asserted in some of the
cases that by negligence in its discharge or by failure to dis-
cover and notify the bank, the depositor either adopts the
checks as genuine and ratifies their payment or estops himself
from asserting that they are forgeries. Such a doctrine
would be in conflict not only with the opinions rendered
in *Weisser* v. *Denison* (*supra*) but with the decision there
actually made. That authority has stood for nearly fifty
years and we would not feel justified in now overruling it.
Nor, if the question were an open one in this state, would we
deem the rule of estoppel or that of ratification a just one. If
the depositor has by his negligence in failing to detect for-
geries in his checks and give notice thereof caused loss to his
bank, either by enabling the forger to repeat his fraud or by

depriving the bank of an opportunity to obtain restitution, he should be responsible for the damage caused by his default, but beyond this his liability should not extend. In the cases cited from the Supreme Court of the United States, from that of Massachusetts and that of Pennsylvania, it is conceded that, if the bank has been guilty of negligence in paying the forged checks, then the doctrine of ratification and estoppel does not apply. It seems to us that the exception is somewhat inconsistent with the principle on which the doctrine rests. Moreover, we see no reason why the bank should be entitled to anything more than indemnity for the loss the depositor's negligence has caused it. In the present case, a check altered by Davis from the sum of $22 to $622 was paid by the defendant to the Colonial Bank, in which Davis had deposited it. Against that bank the defendant has ample recourse. If it were to be held that the plaintiffs are estopped from denying the genuineness of that check as against the defendant, the latter could have no claim against the Colonial Bank, nor is it clear that the plaintiffs would have any direct right of action against that bank. The Colonial Bank took the check solely on the responsibility of Davis. To it the plaintiffs owed no duty. If the plaintiffs and the defendant had never settled their accounts the Colonial Bank could have had no complaint against either party for that cause. A rule which might operate to relieve that bank from the liability it assumed when it collected an altered check merely because the plaintiffs failed in their duty, not to it, but to a third party, should not be upheld. Nor would it operate justly in a case in which the bank had paid a single forgery unless by the depositor's default and delay the bank had lost its opportunity to secure restitution. This question is well discussed by the Supreme Court of Alabama in the case of *National Bank* v. *Allen* (*supra*), and we concur in the view expressed by that court that the liability of the depositor for neglect of his duty to examine and verify his account with the bank is limited to the damages sustained by the bank in consequence of such neglect.

In the present case Davis falsified the additions or totals at the foot of the pages in the check book. But with a few exceptions he did not alter the amounts expressed in the stubs. In no case did he change in the stubs the name of the payee of the check. It is clear, therefore, that at all times a comparison of the returned checks with the stubs in the check books would have exposed the alterations made in the checks. Of course, the knowledge of the forgeries that Davis possessed, from the fact that he himself was the forger, was in no respect to be attributed to the plaintiffs. But we see no reason why they were not chargeable with such information as a comparison of the checks with the check book would have imparted to an innocent party previously unaware of the forgeries. The plaintiffs' position may be no worse because they intrusted the examination to Davis instead of to a third person; but they can be no better off on that account. If they would have been chargeable with the negligence or failure of another clerk in the verification of the accounts, they must be equally so for the default of Davis, so far as the examination itself would have disclosed the facts. We think it plain, therefore, that the finding of the referee that the plaintiffs were not negligent in the examination of the pass book and vouchers is without evidence to sustain it, unless the plaintiffs discharged their duty to the defendant when they committed the examination to a proper clerk and were not responsible for the manner in which the clerk performed the task. From the language of the report of the learned referee it would seem as if this last were the theory on which his decision proceeded. We do not think it can be sustained. If any duty rested on the plaintiffs we do not see why the ordinary rule of principal and agent or master and servant, that the principal or master is liable for the fault of his servant or agent in the master's business, did not apply. This was so held in the case of *Leather Manufacturers' Bank* v. *Morgan* (*supra*), and nothing to the contrary is to be found in *Frank* v. *Chemical National Bank of New York* (*supra*). There it is said: "The alleged duty, at most, only requires the

depositor to use ordinary care; and if this is exercised, whether by himself or his agents, the bank cannot justly complain, although the forgeries are not discovered until it is too late to retrieve its position or make reclamation from the forger." In that case, however, the question of the liability of the principal for the negligence of his clerk did not arise, for the plaintiff made the examination personally. There are exceptions to the general rule of the liability of the master for his employee. But this case does not fall within those exceptions nor within the principle on which those exceptions are based.

These views would render it necessary to reverse the judgment appealed from except for another fact now to be noted. The referee's report is in the form of a short decision and on appeal it is to be presumed that all facts warranted by the evidence and necessary to support the judgment have been found. (*Amherst College* v. *Ritch*, 151 N. Y. 282; *Bartlett* v. *Goodrich*, 153 N. Y. 421; *Marden* v. *Dorthy*, 160 N. Y. 39.) The sixth in sequence of these forgeries was a check of June 20th, 1898, for $12.49, altered to the sum of $112.49, with the name of the payee erased and "Cash" written in the place thereof. The teller of the defendant, who paid the check and was a witness on its behalf, testified that the check showed on its face that the word "Cash" had been written in the place for the payee's name over an erasure; that the number of dollars was also written over an erasure; that he did not like the appearance of the check and that it was in such a mutilated condition when it was presented to him that, before paying it, he required Davis to indorse upon the check a receipt for its amount. That the defendant was grossly negligent in paying the check and has only itself to thank for that loss is apparent. But the effect of that negligence did not cease with the payment of the check. The referee might well have found that, had payment of the check been refused or had Davis been required to obtain the indorsement or guaranty of the plaintiffs as to its correctness, the forgeries of Davis would have been exposed and their repeti-

tion would not have occurred. That Davis was able to successfully continue from this time to his arrest a series of forgeries is as fairly attributable to the folly of the bank in paying to a clerk a check of his employers which had plainly been altered without making inquiry as to the reason or authority for the alteration, as it was to any carelessness of the plaintiffs in failing to detect the alteration when the checks were returned to them from the bank. Since we have held that the question in the case was not one of ratification or estoppel, but that the liability of the plaintiffs to the bank was solely for the loss caused by their negligence, it is a complete answer to the defendant's claim that its own negligence contributed to the loss. The learned counsel for the appellant contends that the plaintiffs' cause of action is not based on negligence and that the plaintiffs cannot sue on contract and recover in tort. This claim is without force. The action unquestionably was brought on contract, but it remains such. The plaintiffs sue for a debt to which the defendant answers: We have paid the money, true, not according to your directions, but in compliance with what we believed to be your directions, and your negligent conduct in your duty towards us led us into that error. To which the plaintiffs rejoin: Your own negligence contributed to the loss. All this may be true, yet the plaintiffs recover not in tort but on contract, for the allegation of negligence on the part of the defendant is used only to defeat its claim for relief on account of the plaintiffs' negligence.

It follows that under the authority of *Weisser* v. *Denison* (*supra*) the defendant is not entitled to credit for the two checks paid by it before the account was balanced and vouchers returned. For the third, fourth and fifth checks, amounting to $300, it is entitled to credit, unless it was guilty of negligence in their payment, a fact which is neither found by the referee nor established by the evidence. For the sixth check and the subsequent ones it is not entitled to credit because of its negligence in paying the sixth check.

The judgment should be reversed and a new trial granted,

costs to abide the event, unless the plaintiffs consent to deduct from their recovery the sum of $300 with interest from November 15th, 1899, in which case the judgment, as modified, should be affirmed, without costs of this appeal to either party.

VANN, J. (dissenting). Whether the plaintiffs exercised reasonable care in examining the checks returned as vouchers by the defendant was a question of fact, and, as they intrusted the work to a competent agent and took other precautions, there was evidence to support the finding in their favor, which, after affirmance by the Appellate Division, is conclusive here. (*Amherst College* v. *Ritch*, 151 N. Y. 282.)

In my opinion the judgment below should neither be reversed nor modified, unless the court reaches the conclusion that the plaintiffs had constructive notice of what their agent discovered in examining the checks. The rule which imputes to a principal knowledge acquired by his agent rests upon the presumption that the latter has disclosed all the material facts to the former. This presumption does not extend to a fact which, if disclosed, would subject the agent to a prosecution for crime or defeat a scheme in which he was engaged to defraud his employer. (*Henry* v. *Allen*, 151 N. Y. 1, 9; *Benedict* v. *Arnoux*, 154 N. Y. 715, 728; *Bienenstok* v. *Ammidown*, 155 N. Y. 47, 60; Pomeroy on Eq. Jur. § 675.) The dishonesty of the agent changes the situation, for the necessity of concealing his dishonest acts, in order to prevent exposure and punishment, destroys the presumption which would otherwise prevail that he had made the facts known to his principal. A presumption must be reasonable or it cannot exist, and it would not be reasonable to expect one engaged in executing a fraudulent project to make a disclosure which would not only defeat his purpose but would send him to prison. Knowledge is not imputable when the agent is acting in hostility to his principal, or is engaged in perpetrating or concealing a fraud.

In this case the agent committed the furtive acts and knew

all about them long before he examined the vouchers returned
by the bank. He discovered no fraud while making that
examination, for he knew all before, and could not discover
what he already knew. He found out nothing while acting
as agent, but only while acting on his own account. He was
still engaged in his scheme to defraud when he made the
examination, and concealment was as necessary then as it had
ever been. In concealing the fraud he did not act as agent,
and he was engaged in concealing the fraud all the time after
he began to carry on his system of forgery, and was so engaged
when he examined the checks. In *Frank* v. *Chemical Nat.
Bank* (84 N. Y. 209) the court said: "It was only because
Goodheim was the criminal that the examination did not dis-
close to them the forgeries. He was not the plaintiffs' agent in
issuing the forged paper, nor was he their agent in abstracting
the false vouchers and falsifying the books, which was done
in aid of his criminal purpose." If Goodheim, whose duty it
was to examine the vouchers, discovered nothing imputable to
the plaintiffs in that case, how could Davis, in examining the
checks, make a discovery binding upon the plaintiffs in this
case? Goodheim abstracted the false vouchers, so that the
examination made by himself and the depositor would disclose
no wrong, except by their absence, and Davis, whose duty it
was to use the check punch, so used it as to leave sufficient
space next to the dollar sign in which to subsequently cut a
figure and thus raise the amount of the check. He also
changed the footings at the bottom of the stub page of the
check book so as to prepare for the examination. If what
Goodheim did was not binding on his principal, how can we
say that what Davis did was binding on the plaintiffs? In
neither case can the duties of the dishonest agent be so sepa-
rated as to distinguish the fraud in concealing the forgery
from the forgery itself, for each act was part of a single
scheme. The forgery, the preparation for concealment and
the constant concealment were successive steps in the same
transaction. It cannot be held that what Davis would have
discovered if he had not been the forger but somebody else, is

imputable to the plaintiffs without also imputing to them knowledge of the space left to punch out another figure, as well as of the false footings, for these acts were within the scope of his employment as much as the examination of the vouchers. In every case of successful fraud by an agent, it is the nature of the duties intrusted to him that enables him to perpetrate the fraud, and it is erroneous reasoning to say that if a part of those duties had been intrusted to another clerk, as he would have found out the facts, they must be imputed to the principal, because the latter in good faith assigned such duties to the criminal.

Under the circumstances, it cannot be presumed that Davis disclosed facts which an honest agent might have discovered in looking over the checks, but which the former knew before the checks came to his hands for examination, without subverting the reason upon which the rule of imputed knowledge is founded. Entertaining these views, I am compelled to dissent from those expressed in the prevailing opinion, so far as they are inconsistent with this memorandum, and to vote in favor of affirmance.

PARKER, Ch. J., HAIGHT and WERNER, JJ., concur with CULLEN, J.; MARTIN, J., concurs with VANN, J.; BARTLETT, J., takes no part.

Judgment accordingly.

WILLIS N. BRITTON, Respondent, *v.* CHARLES J. FERRIN, JR., et al., Appellants.

1. PRINCIPAL AND AGENT — RELATION BETWEEN FACTOR AND PRINCIPAL IS FIDUCIARY. The relation between a commission agent or factor for the sale of goods and his principal is fiduciary, and in the absence of an express agreement or one implied from the course of business or dealing between the parties, giving to the former the right to appropriate to his own use the proceeds of sale, they belong to the principal, subject only to the lien of the agent for commissions and other advances and charges, and the principal may follow and reclaim them so long as their identity is not lost, subject to the rights of a *bona fide* purchaser for value.

2. WHEN REFUSAL TO PAY OVER PROCEEDS OF SALES CONSTITUTES CONVERSION — WHEN PRINCIPAL'S DEBT TO THIRD PERSON CANNOT BE

COUNTERCLAIMED IN ACTION THEREFOR. Where, under such circumstances, factors upon a seasonable demand refuse to surrender such proceeds, they will not be permitted in an action by the principal, to defeat or diminish a recovery therefor by purchasing the claim of a third person against him and interposing it as a counterclaim, for two reasons: 1. The action is under section 549 of the Code of Civil Procedure one of tort, and secures to the plaintiff the same rights and remedies that exist as to other wrongs of a similar character. 2. The attempt to enforce such counterclaim is an effort to deal with the funds of the principal for their own benefit, and thereby defendants assume a position incompatible with their duties, adverse and antagonistic to his rights, and which are in direct conflict with his interest.

*Britton* v. *Ferrin*, 57 App. Div. 622, affirmed.

(Argued April 8, 1902; decided May 13, 1902.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered December 28, 1900, affirming a judgment in favor of plaintiff entered upon a verdict directed by the court and an order denying a motion for a new trial.

The plaintiff alleged in his complaint that he delivered to the defendants, who were commission merchants in the city of Buffalo, two carloads of apples and a carload of apples and onions, which were the property of the plaintiff, and employed the defendants to sell the same upon commission; that they were sold by the defendants for the aggregate sum of $999.35, and they received that sum for the plaintiff in a fiduciary capacity; that the charges amounted to $256.63, leaving a balance of $742.72, which the plaintiff demanded of the defendants, which they wrongfully refused to pay and wrongfully converted to their own use.

The defendants admitted that they were copartners; that the plaintiff consigned the goods mentioned; that they were sold by the defendants for prices aggregating the sum alleged; that their charges were the amount stated, and that before the commencement of the action the plaintiff had demanded payment of the sum of $742.72. The other allegations of the complaint were denied.

The defendants then specially alleged that they did not receive the proceeds of such sales in a fiduciary capacity, and

that the plaintiff never demanded or was entitled to the identical proceeds thereof. They then alleged that there was a general custom and course of dealing among commission merchants throughout the country and at Buffalo, which was well known to the plaintiff; that their relation was that of debtor and creditor, and that such was the custom and course of dealing and contract between the parties; that they subsequently sent to the plaintiff an account of the various sales made by them, showing the gross proceeds, expenses and commissions, and the net proceeds of each car, and that the plaintiff accepted their personal credit therefor; that before the commencement of the action the plaintiff accepted the defendants' agreement to pay such proceeds as an ordinary debt, and terminated all and any fiduciary character with respect thereto, waiving all and any claim for damages by reason of any tort with respect to the use of such proceeds.

The defendants then set up as a third and partial defense and counterclaim that on the sixth of August, 1896, a settlement of the accounts was had between the parties, including the transactions mentioned in the complaint, whereby it was found and determined that the defendants owed the plaintiff only the sum of $13.71 which they agreed to pay on demand.

For a fourth and separate defense and counterclaim the defendants alleged that in 1895 there were certain agreements and transactions between the plaintiff and Ferrin Brothers Company, a domestic corporation, whose place of business was in Rochester, for the handling and selling of farm produce, and upon such dealing between the corporation and the plaintiff there was a balance due the corporation in the sum of $729.01, and that that cause of action was assigned by the corporation to the defendants which they sought in this action to counterclaim against the plaintiff's demand.

Upon the trial, when the evidence was closed, the court held that the action was for money received by the defendants in a fiduciary capacity, and, consequently, that the assigned claim to the defendants could not be counterclaimed in this action. The defendants then asked to be permitted to submit

to the jury the questions whether there had been a conversion; whether there was any fiduciary relation between the parties, and whether or not that fiduciary relation was terminated before the commencement of the action. This was denied and the defendants excepted. The court thereupon directed a verdict for the plaintiff for $949.14. A motion was made for a new trial on the minutes, based upon the exceptions taken at the trial, which was denied. The defendants thereupon appealed to the Appellate Division from the judgment and order, where both were unanimously affirmed.

*Nelson E. Spencer* for appellants. The court having directed a verdict, appellants are entitled to the most favorable inferences deducible from the evidence, and all disputed facts are to be treated as established in their favor. (*McDonald* v. *Metropolitan Ry. Co.*, 167 N. Y. 66.) The usages proven were reasonable, uniform, well settled, not in opposition to the fixed rules of law, not in contradiction of any express terms of contract between the parties, and must be deemed, therefore, to have entered into the intention of the parties. (*Hinton* v. *Locke*, 5 Hill, 437; *Walls* v. *Bailey*, 49 N. Y. 464; *Newhall* v. *Appleton*, 114 N. Y. 140; *Robertson* v. *N. S. Co.*, 139 N. Y. 421; *Johnson* v. *De Peyster*, 50 N. Y. 666; *Smith* v. *Clews*, 114 N. Y. 194.) An action in tort does not lie against defendants. Plaintiff's sole cause of action was on contract. (*Connaughty* v. *Nichols*, 42 N. Y. 83; *Greentree* v. *Rosenstock*, 61 N. Y. 583; *Laverty* v. *Snethen*, 68 N. Y. 522; *Segelken* v. *Meyer*, 94 N. Y. 473; *Harris* v. *Shultz*, 40 Barb. 315; *Stoll* v. *King*, 8 How. Pr. 298; *White* v. *Platt*, 5 Den. 269; *Commonwealth* v. *Stearns*, 43 Mass. 343; *Vail* v. *Durant*, 89 Mass. 408; *Steamship Co.* v. *Seager*, 31 App. Div. 288.) It was error to exclude defendants' counterclaim. (Code Civ. Pro. §§ 500, 501; *Steamship Co.* v. *Seager*, 31 App. Div. 288; *Rosenburg* v. *Block*, 102 N. Y. 255; *Moffatt* v. *Fulton*, 132 N. Y. 519.) Plaintiff failed to prove any actionable wrong. (*N. B. & D. Bank* v. *Hubbell*, 117 N. Y. 384; *Smith* v. *Ogilvie*, 127 N.

Y. 143; *Moffatt* v. *Fulton,* 132 N. Y. 507; *Stoll* v. *King,* 8 How. Pr. 298; *White* v. *Platt,* 5 Den. 269; Mechem on Agency, § 1022; Russell on Factors & Brokers, 271; *Decatur* v. *Goodrich,* 44 Hun, 3; *Liddell* v. *Paton,* 7 Hun, 195; *Buchanan* v. *Woodman,* 1 Hun, 639; *Moranye* v. *Waldron,* 6 Hun, 529; *Chapman* v. *Forsyth,* 2 How. [U. S.] 202; *Donovan* v. *Connell,* 9 Civ. Pro. Rep. 222.) There was evidence that plaintiff had made a final election to ratify defendant's treatment of the matter as a mere debt and had waived his right of action in tort, if he ever had any, and defendant should have been allowed to go to the jury. (*Cairnes* v. *Bleeker,* 12 Johns. 300; *Vianna* v. *Barclay,* 3 Cow. 281; *Jervis* v. *Hoyt,* 2 Hun, 637; *Bowen* v. *Mandeville,* 95 N. Y. 237; *Conrow* v. *Little,* 115 N. Y. 387; *Terry* v. *Munger,* 121 N. Y. 161; *Moller* v. *Tuska,* 87 N. Y. 166.)

*John Desmond* for respondent. The relation between a commission agent for the sale of goods and his principal is fiduciary; and, in the absence of an express agreement or one implied by the course of dealing between them, giving the former the right to appropriate to his own use the proceeds of sales of the principal's goods, such proceeds belong to the principal. (*Baker* v. *N. Y. Nat. E. Bank,* 100 N. Y. 31; *Moffatt* v. *Fulton,* 132 N. Y. 507; Mechem on Agency, §§ 454–457, 1007; *Kelley* v. *Bradley,* 9 Hun, 283; *Wallace* v. *Castile,* 14 Hun, 106; *Moore* v. *Hillabrand,* 37 Hun, 491; *Dugurd* v. *Edwards,* 50 Barb. 288; 100 N. Y. 34.) This is an action in tort. (Code Civ. Pro. §§ 549, 1487; Mechem on Agency, §§ 454–457, 1007; *R. D. Co.* v. *O'Brien,* 72 Hun, 462; Russell on Factors & Brokers, 272, 273; *Moffatt* v. *Fulton,* 132 N. Y. 507; *Fayerweather* v. *Tucker,* 11 N. Y. Supp. 39; *S. S. R. Co.* v. *Dayton,* 70 N. Y. 486; *Roehr* v. *Dawson,* 15 Civ. Pro. Rep. 417.) In an action of tort a counterclaim on contract cannot be interposed. (*Davis* v. *Aikin,* 85 Hun, 554; *R. D. Co.* v. *O'Brien,* 72 Hun, 462; *People* v. *Dennison,* 84 N. Y. 273; *Smith* v. *Hall,* 67 N. Y. 48; Russell on Factors & Brokers, 273, 274.)

MARTIN, J.    That the defendants were commission merchants to whom the plaintiff shipped three carloads of fruit and onions to be sold by them on commission, which they sold, the proceeds netting $742.72, was plainly established and is not denied.    The plaintiff demanded this sum of the defendants, which they refused to pay.    The only manner in which they sought to defeat or diminish the plaintiff's recovery therefor was by means of a counterclaim based on an account or debt they purchased against him, amounting to nearly that sum.    The trial court held that such a counterclaim could not be allowed in this action, and directed a verdict for the plaintiff for the amount of his demand.    The exceptions of the defendants to that direction and to the refusal of the court to submit certain matters to the jury, present the only question involved upon this appeal.

The defendants endeavored to sustain the theory that a demand assigned to them by a third person might be counterclaimed against the defendants' cause of action, by denying that they received the plaintiff's goods or the proceeds thereof in a fiduciary capacity, and by proving that there were certain general customs and usages in that business with reference to receiving, handling and accounting for goods consigned to them by shippers, which were usual among commission merchants, and that they handled the proceeds of merchandise consigned by him to the defendants in the fall of 1895, in accordance with those customs.    The proof was that it was the general custom to receive shipments, pay the charges, sell the goods to the best possible advantage as promptly as possible, render account of sales to the shipper as fast as shipments were closed out, and to at once pay the net proceeds by their check; that the goods were sold to the best advantage both for cash and on time, that they were sold on credit only to responsible parties, but if losses followed the commission merchant was to sustain them; that all the receipts for produce sold were placed in one drawer, from which change and deposits in the bank were made; that the proceeds of the particular property of each shipper were not kept separate;

conjecture without any support in the evidence. This I think is a mistake, since the record shows that the defendants' witnesses, some of them experts, and a part of whose testimony is quoted upon the brief of the plaintiff's counsel, while stating that it was possible to place the plant elsewhere or subdivide it, if the place could be found or procured, stated in almost the same breath that it would be impracticable to do so for very cogent reasons which they gave, and if done, the aggregate damage and public inconvenience would not be less. It is impossible to read the testimony as a whole and then say that the court was not authorized to make the finding in the very words that he employed. It is not quite fair, as it seems to me, for a court of last resort, reviewing a case upon findings, to fasten upon a single sentence in an entire finding and divide the sentence, adopting what is supposed to be favorable to the plaintiff and rejecting what is supposed to be favorable to the defendant, in order to work out, as matter of law, a nuisance from the language employed. It is admitted that the court used the short form of decision permitted by the Code and, hence, he is deemed to have found all the facts necessary to support his judgment since the decision has the same legal effect as the general verdict of a jury on the issues, as we have repeatedly held. This general verdict has not been disturbed by the reviewing court below, as it had the power to do upon the facts, and this court must accept the findings just as they are.

That the plaintiff sustained great annoyance and serious damage from the location and use of the thing of which he complains there can be no doubt. It is said that the damage is special which, I take it, means nothing more than that his damages are greater, relatively, than his neighbors generally have sustained. The amount of the damages cannot change the rule of law. The laborer in a tenement house who has been under like conditions and circumstances, damaged to the extent of one hundred dollars only, has the same standing in the courts to enforce his claim as the plaintiff. The answer to both claims is the same, and is to be found in the language of Judge MAR-

TIN in this court (169 N. Y. 282): "In every civilized community controlled by governmental or municipal laws or regulations, there are many cases where the individual must be subjected to remote or consequential damages or loss to which he must submit without other compensation than the benefit which he derives from the social compact." This, in my opinion, is one of the cases referred to. The city, under the authority of the state, is engaged in a great public work that injuriously affects the business and property of hundreds of people on the line of the work and in the vicinity. Many of them have been and are damaged proportionally as much and perhaps more than the plaintiff. The strain upon the nervous system of the aged and feeble and the sick from the constant blasting and other operations must be very great, and while the plaintiff has lost money, some of his neighbors may have suffered in a way that money cannot compensate. If he is entitled to be made good so are they. All that is necessary is that they bring to this court the finding of a jury or a court to the effect that the subway could have been located on some other street or at some other point. The legislature did not give express or specific directions to locate the railroad in any particular street, any more or in any other way than it gave like directions to locate the place for the appliances necessary for its construction. All that was properly left to the local authorities, and if their decision does not protect the defendants from liability in this case for the alleged nuisance, neither would it protect them for converting the streets of the city into a broad and deep ditch, to the annoyance and damage of thousands of people. If the thing complained of in this case is a nuisance so is the ditch, since both things were located by the same authority. It does not help much to say that we are not to be understood as formulating "any general rule" in this case. If the decision rests firmly upon law and reason that warning is superfluous. It is impossible to decide the case without laying down a rule applicable to all cases depending on the same or similar facts and legal principles. Surely it cannot be presumed that the plaintiff is the only person in the city

who can make out such a case as we now have before us. If the plaintiff is able to spell out a nuisance from adverse findings upon which he was defeated at the trial, how will it be with others who may succeed at the trial and procure more favorable findings from a court that may feel constrained to follow our decision in this case and these findings are unanimously affirmed? The truth is that the decision of any court born of a struggle to give relief to a particular person, when thousands in the same community have relatively a similar grievance, is quite sure at some time and in some way to come back to plague and vex the court that made it, and then it must be explained away by some specious but flimsy argument or silently ignored.

There is one passage in the prevailing opinion which seems to constitute the corner stone of the decision. Here it is : " It is evident that the plant could be located in sparsely settled districts near the river front, and not cause a tenth part of the damage that would arise in maintaining it at the point selected by these defendants, or in the heart of the residential portion of the city, like Fifth Avenue, Madison Avenue, or some other localities that might be named." But how is all that so *evident?* Certainly not from the findings that are our sole guide as to the facts. Hence this is but another way of saying that the court, when hard pressed for a reason, will fling away the findings and act upon its own notions of the real situation. The natural and reasonable place for the appliances necessary to construct the work is at or near the locality where the work is to be done. The notion that they should have been placed at some point a mile or more distant is but an extreme and fanciful suggestion. It does not require an expert to see that such a thing, while possible, was not reasonable nor practicable. That is what the learned trial court has found, and I assume he was as well informed on that question as we are or can be. It was a question involved in the issues before him and of which he had jurisdiction. It is a question now of which we have no jurisdiction outside of the findings made. But the residents of the fashionable avenues named

are to have the benefits of rapid transit practically at their doors, and is this court to hold that they must be exempt from the annoyance and damage incident to the construction of the tunnel, and that it should be shifted to the people in the sparsely settled districts, wherever that place is, or upon the people on the river fronts? Nay more, are the defendants, the contractors building the subway, guilty of creating and maintaining a nuisance simply because they have not done enough to shift the annoyance from the former to the latter? If that is law it must be that a noxious thing near one of the fashionable residences or hotels on one of these avenues is a nuisance, while the same thing, used in the same way, when placed near the home of a laborer or more humble man of business would not be a nuisance at all. Grant that the latter would not be able to prove more than ten per cent of the damage that the plaintiff has, as the court suggests, would the thing for that reason be any the less a nuisance? If the thing complained of is a nuisance where it is, why would it not be a nuisance if placed near the home of a laborer or mechanic? And yet the only ground of liability suggested in this case is the neglect of the defendants to favor the former by afflicting the latter. I have no doubt that all the reasons that have ever been or can be given to support the judgment about to be rendered by this court in this case are fairly embodied in the opinion of the court, and those reasons there expressed will speak for themselves. The issue in this case is one of law, and in its last analysis a very plain and simple one. On the one hand it is asserted that the trial court found that the thing complained of was and is a nuisance, while on the other it is asserted that the finding is the other way and plainly to the effect that it is *not* a nuisance. Therein lies the whole controversy. We cannot advance one step towards the solution of this question by generalizing as to the extent of the plaintiff's damages or speculating with respect to the part of the city where the thing in question should have been placed. All that is foreign to the question at issue and only tends to mislead. What is the fair meaning and legal import of the

language which the learned trial judge used in the findings? That is the question and the whole question.

We have very recently held that a property owner sustaining damages in the form of a physical injury to his house and buildings, caused by a contractor in the one case and the city itself in the other when engaged in a public work, could not recover for the damage and injury in the absence of proof of negligence (*Holland House Co.* v. *Baird,* 169 N. Y. 136; *Uppington* v. *City of N. Y.,* 165 N. Y. 222), and so this court has held that the temporary use of structures like the one in question in the construction of an aqueduct, injurious to adjoining property owners, constituted no cause of action in favor of the party injured against the city. (*Lester* v. *Mayor, etc., of N. Y.,* 150 N. Y. 578, affg. *S. C.,* 79 Hun, 479.) What the legal distinction, if any, is between the damages claimed in these cases and the damages claimed in this case I cannot perceive and no one has attempted to state. I am not in favor of making use of the equitable powers of the court, including the writ of injunction, for the sole purpose of coercing these defendants to pay money to the plaintiff, under the name of damages, which the latter could not recover in an action at law.

But I am mentally admonished that I must be wrong at some point in the discussion, since my learned brethren, for whose opinions I have great respect, even when given as in this case, dogmatically and without argument, differ so radically with me. I have endeavored, however, to make my reasons plain to the end that my error, if any, may be easily detected and readily refuted. I think the law and the facts in the case were correctly decided by the trial court and that there was no legal ground for reversing the judgment.

Since writing the above, Judge CULLEN, another of my associates, has very wisely and properly thought it necessary to add something to the discussion. Agreeing entirely as he does with Judge BARTLETT, who holds that *upon the findings of the trial court as made* the plaintiff was entitled to recover, he proceeds immediately to demolish these very findings,

because made without what he calls *sufficient evidence*, and he cites a case to prove that this court must sustain the reversal below upon the law when the findings have not sufficient evidence to support them.

Of course he does not mean quite what he says, since the case cited does not hold anything of the kind. What it does hold is that this court in such a case may disregard the findings that have *no evidence whatever* to sustain them. If the evidence was thought to be insufficient the court below should have reversed upon the facts, but I venture to say that no one will be able to point out a single finding made by the trial court that has not the support of at least some evidence. Indeed, it is difficult to see how any other findings could have been made. It is quite impossible, however, to reconcile the two opinions. They are inconsistent with each other and each is, in some respects, inconsistent in itself. Inasmuch as Judge Cullen agrees with Judge Bartlett, he must assume the findings in the record to be the findings in the case; and to stand upon the findings as made in one breath, and to throw them away as worthless in the next, does not strike me as a very logical or consistent method of argument. When we find one opinion standing squarely on the findings and the other agreeing with it, but at the same time seeking to destroy these very findings, there must be some confusion of thought or want of harmony in the argument. It only illustrates, however, the vague and illusive theories that may sometimes be used with the very best intentions to sustain a case. It would be much more satisfactory if we could learn just what finding it is that is without sufficient evidence to sustain it if we are to review the case in that way. There was but one general, fundamental fact in issue in the case, and that was whether the thing complained of was or was not a nuisance. The plaintiff alleged that it was and the defendants denied that allegation. Therein was involved the whole issue of fact in the case, and it is obvious that the plaintiff could not succeed unless the trial court found that issue in his favor. That court not only refused to so find, but actually found that it

was not a nuisance. All the other allegations of the complaint and the other findings are merely evidentiary. The trial court having negatived the fundamental fact in the plaintiff's case, this court cannot supply it unless the proof on that subject was conclusive in support of the plaintiff's allegation that it was a nuisance. No one has yet ventured to say that. So we must go back to the point from which we started, and that is concerning the legal effect of the findings as made.

If the court found in terms, or in substance, that the thing is a nuisance, then this court, I admit, has some ground to stand upon; but otherwise not. The argument, or rather the assertion, that the use of the public place in question during the progress of the work is *not* temporary, while the use of the bed of the street for the same time *is* temporary, does not seem to me to meet the situation. The thing complained of is either temporary or permanent. No one has ventured to assert that it is permanent, and hence it must be temporary. The statute authorized the public authorities to grant such temporary privileges to the contractor for the purpose of facilitating the work, and the court found that the authorities did make the grant to the defendants. The city authorities consented, and so did the rapid transit commission. What does the statute mean by "temporary privileges," if it does not mean the use of some of the public places, like the one in question, while the work lasts? It is so obvious that that was the very purpose of the statute that it seems to me that there is no room for any other construction. It is not a very fair or intelligent answer to the question suggested above to say that whatever it means, it does not mean that the authorities have power to grant to the defendants the privileges which they did. That is only a bald assertion, unsupported by either reason or authority.

But it is said that the case of *Morton* v. *Mayor, etc., of N. Y.* is decisive of this case. That assertion seems to me very much like jumping at a conclusion. If there is no difference or distinction between the erection of a permanent power house

that jars and shakes the walls of an adjacent dwelling house, and is to do that for all future time, rendering the house untenantable, and the use of the square in question, as it is used, only during the time that the work of constructing the tunnel lasts, then that case has some application here. But I supposed there was a very broad distinction in the circumstances of the two cases, and how any one can avoid seeing that distinction, even if he should try, is one of the many things in this case that I have not been able to understand. That case might just as well be cited to sustain an injunction against the defendants for opening the broad and deep ditch in front of the plaintiff's hotel, since it would be just as applicable then as it is now. In both cases it is the occupation of a public place for the purpose of constructing a public work which is a damage to the plaintiff's business.

It will be seen that Judge CULLEN has ignored the finding of the trial court that the thing in question could not practically be placed elsewhere, without inflicting the same damage on some one else. He does not even claim that the finding is without evidence, and such a claim could not fairly be made on the evidence in the record.

I still think that the learned trial judge decided this case correctly. He did not allow sentiment or sympathy to enter into his decision, but followed the law.

GRAY, HAIGHT and WERNER, JJ., concur with BARTLETT and CULLEN, JJ. O'BRIEN, J., reads dissenting opinion, and PARKER, Ch. J., concurs.

Ordered accordingly.

---

SIGUA IRON COMPANY, Respondent, *v.* HAROLD P. BROWN, Appellant.

1. TRIAL — REQUESTS FOR DIRECTION OF A VERDICT. The request by both parties for the direction of a verdict amounts to a submission of the whole case to the trial judge, and his decision in plaintiff's favor upon the facts has the same effect as if the jury had found a verdict in the plaintiff's favor after the case was submitted to it.