consistent with that status. Is it conceivable that, if she was the owner of the property, even if she would have so stood at gaze during her uncle's life, and then during his wife's life for years, she would not, at least, have made some assertion of her rights, or given some notification of her interest to the defendant? She was not bound to him by any tie, or, so far as appears, even constrained by any acquaintance. Is it natural that the real owner and the record owner as well of realty should stand by in silence to see a stranger enter into her premises, enjoy them, and profit from them for six years? It is true that the court finds that the defendant entered into possession without the consent of the plaintiff, and continued without her permission; but so far as the evidential fact is concerned, she testifies:

"Since the time of Bridget's death, I heard that Bishop McDonnell was in possession of the property, of the lands themselves. * * * I knew that from a short time after Bridget's death down to the present time. I knew that from Bridget's death down to the time I commenced these actions the Bishop was paying the expenses of the property, and taking all of the rents."

The learned Special Term finds that she did not have any conversation with the defendant's counsel or make any statement to him. I am inclined to think that finding was by inadvertence; but, in any event, it seems to me that it cannot stand: First, because the defendant's counsel as a witness testifies to it positively; second, because the plaintiff does not deny it, and also testifies, "I didn't have much conversation with Mr. Owens,"—thus admitting that she had some conversation with him; and, third, because opposed to this is only the general statement of her brother-in-law that she (the plaintiff) didn't say anything at that time under his instructions. If she said "that her uncle promised to give her the house in which he lived when he died," the remark is significant almost to the verge of an admission. Such delay with such full knowledge as appears in this case, were the plaintiff a cestui que trust seeking to enforce her rights against a nominal grantee, would be almost if not altogether fatal to her claim. Hill on Trustees, 410. I am well aware of the difference in this case due to the fact that the plaintiff is armed by the legal title, and yet it seems to me that her delay, even under the circumstances, has some significance. Many of these facts are similar to those in Church of St. Stanislaus v. Algemeine Verein, 31 App. Div. 133, 52 N. Y. Supp. 922, affirmed 164 N. Y. 606, 58 N. E. 1086, and, I think, are stronger.

---

(51 Misc. 503)

COLGATE et al. v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Special Term, Westchester County. October 18, 1906.)

1. RAILROADS—INCORPORATION—RIGHT OF WAY DEEDS—CONSTRUCTION.

The Hudson River Railroad Company was incorporated by Laws 1846, p. 272, c. 216, for a term of 50 years, with power to purchase, receive, and hold "in fee simple" such real estate as was necessary for the objects of the corporation; and section 10 declared that, on condemnation of property for a right of way, the railroad company should be seised in fee thereof during the continuance of the corporation by that or any other act. The Hudson River Railroad Company was afterwards consolidated with the New York Central Railroad Company, as authorized by Laws 1869, p.

2399, c. 917, and the term of the existence of the new corporation was fixed at 500 years. *Held*, that where a right of way deed to the Hudson River Railroad Company recited that the grant was made for the purposes of a railroad, according to the act incorporating the grantee, and any act amendatory thereof, and that when the company should cease the lands and premises so conveyed should revert to the grantor, his heirs and assigns, the railroad's title to such right of way did not terminate on the expiration of the time for which the grantee was incorporated, but the title was vested in the consolidated corporation for use during the continuance of its existence.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, §§ 155, 156, 448–452.]

2. Same—Use of Tracks—Number.

Where the original act incorporating a railroad (Laws 1846, p. 272, c. 216) limited the number of tracks to three, but the railroad company was thereafter consolidated under a general consolidation act (Laws 1869, p. 2403, c. 917, § 8), which contained no limit as to the number of tracks the railroad company could use, the consolidated corporation was not limited to three tracks.

3. Injunction—Trespass—Encroachment—Mandatory Injunction.

A railroad company trespassed on complainant's property to the extent of four feet by the maintenance of a riprap wall and a toolhouse, and by filling in outside the strip at the north end of the property for the purpose of a switch. These encroachments existed before suit for trespass was commenced, and immediately thereon defendant desisted its work, and commenced condemnation proceedings to acquire the land. *Held*, that complainant was not entitled to a mandatory injunction requiring the removal of the structures, etc.

4. Railroads—Negligent Operation—Nuisance.

Where a railroad company so operated its line adjoining complainant's property in the residence portion of a city that stock trains would be left stalled on the track, with the accompanying noises, offensive odors, etc., at all hours of the day and night, interfering with the reasonable enjoyment of the property, and also permitted unnecessary whistling and bell ringing, such acts constituted a nuisance, entitling complainant to an injunction.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Railroads, §§ 720–724; vol. 37, Cent. Dig. Nuisance, §§ 23, 24.]

Suit by Susan F. Colgate and others against the New York Central & Hudson River Railroad Company to enjoin defendant from operating its railroad over a 66-foot strip of land adjoining complainant's premises in the city of Yonkers, and from encroaching on complainant's property west of such strip, and from operating its railroad, so as to constitute a nuisance. Decree for complainant.

De Witt, Lochman & De Witt, and James M. Hunt, for plaintiffs. Albert H. Harris and Alexander S. Lyman, for defendant.

KELLY, J. The plaintiffs claim that the deed under which defendant holds the 66-foot strip of land lying between plaintiffs' upland and the Hudson river, limits defendant's title to a period of 50 years from May 12, 1846, and the use of the premises conveyed to the operation of three tracks. Plaintiffs claim that the deed in question to defendant's predecessors, the Hudson River Railroad Company, conveyed the strip to be held only during the corporate existence of that company, and that such corporate existence terminated on May 12, 1896, on which date the title to the 66-foot strip reverted to them

as the grantees of the original grantor the common source of title, and that defendant conceding its intention to construct and operate an additional track to the three now in use upon the strip in question, and upon additional land which it is seeking to acquire in pending condemnation proceedings, it thus contemplates the operation of four tracks, which operation the plaintiffs allege is unlawful. It is also charged that defendant has threatened to encroach, and has encroached, on plaintiffs' land under water to the west of the 66-foot strip. A riprap wall supporting defendant's tracks encroaches over the west line of the 66-foot strip into the river for some four feet, and near the north end of plaintiffs' property, defendant has filled in some 12 feet in the river constructing a switch track or siding connecting its main tracks with a powerhouse built west of the strip in question, but north of plaintiffs' property. A toolhouse opposite the southerly end of plaintiff's premises also encroaches some four feet into the river, and west of right of way strip. Plaintiffs have a grant of land under water from the state outside defendant's 66-foot strip. There does not appear to be any dispute as to these encroachments. It appears that the plaintiffs have not improved or filled in the land under water granted to them by the state, the defendant is not adding to the encroachment, but has instituted condemnation proceedings to obtain additional width for its railroad at this point, including the land on which the trespass has been committed. The claim that defendant's right to the 66-foot strip has terminated is based upon the language of the deed under which it claims title. This deed was made by one Sampson Simpson to the Hudson River Railroad Company, and bears date August 17, 1847. For a consideration of $700, it conveys the 66-foot strip to the Hudson River Railroad Company and to their successors and assigns forever with covenants of seisin right to convey, and warranty followed by this clause:

"But it is expressly understood and agreed between the parties aforesaid by these presents that the above grant is made for the purposes of a railroad and ways according to the true intent and meaning of the act incorporating the said parties of the second part and the act amendatory thereof; for those purposes only, and subject to the provisions of said acts."

An agreement was executed on the same day between Simpson and the Hudson River Railroad Company; the deed and agreement both being recorded in the Westchester county clerk's office, referring to various matters not relevant to the issues herein determined, but referring to the strip conveyed and containing the following clause:

"When the said company shall cease, the land and premises so conveyed by the said Sampson Simpson to the said company shall revert to said Sampson Simpson, his heirs and assigns."

The act incorporating the Hudson River Railroad Company referred to in the deed is chapter 216, p. 272, Laws of 1846, passed May 12, 1846; the only act amendatory thereof, which had been passed at the date of the Simpson deed, was chapter 31, p. 23, Laws 1847, passed March 20, 1847, which however, does not affect the question at issue. The charter of the Hudson River Railroad Company (Laws 1846, p. 272, c. 216) constitutes the stockholders, a body public and corporate by

the name of "The Hudson River Railroad Company" with power to construct a single, double, or treble railroad or way between the cities of New York and Albany for the purpose of transporting property and persons "for the term of 50 years from the passage of this act." In section 9 (page 275) of the act, it is provided that:

"The said corporation is hereby empowered to purchase, receive and hold in fee simple such real estate and other property as may be necessary for the objects for which this corporation is granted."

Provision is made for the condemnation of property which cannot be purchased, and it is provided in section 10, that upon confirmation of the awards made by commissioners appointed by the court, and record of the order, the corporation "shall thereupon become seised in fee of such land during the continuance of the corporation by this or any subsequent act, and may take hold and use the same for the purposes of said road." It is provided in the last section of the act (section 36, p. 285): "The Legislature may at any time alter or repeal this act." The term of 50 years from the passage of the act expired on May 12, 1896. Plaintiffs' contention is that thereupon the title to the strip vested in them as the successors by deed of Sampson Simpson. Defendant contends that in no case could they maintain the claim now asserted, because the right of re-entry was for breach of condition subsequent, personal to Simpson and his heirs, and not assignable—citing Saunders v. N. Y. C. & H. R. R. Co., 144 N. Y. 75, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729, and cases therein cited. But, without passing on this last proposition, I think plaintiffs' contention must fail for the following reasons:

In 1869 the Legislature passed the act relating to the consolidation of existing railroad corporations (Laws 1869, p. 2399, c. 917). It was made lawful for any railroad company or corporation organized under the laws of this state, or of any other state "to merge and consolidate its capital stock, franchises, and property, with the capital stock, franchises, and property of any other railroad company or companies organized under the laws of this state  *  *  *  whenever the two or more railroads of the companies or corporations so to be consolidated, shall or may form a continuous line of railroad with each other or by means of any intervening railroad, bridge, or ferry." The act contained provisions as to the method by which such consolidation or merger should be effected, and, by section 4 (page 2402), provided that, upon the consummation of the act of consolidation, the franchises and property of each of the corporations, parties to the same, should be transferred to and vested in the new corporation without further act or deed, "and the title to all real estate taken by deed or otherwise under the laws of this state, vested in either of such corporations, parties to said agreement and act shall not be deemed to revert, or be, in any way impaired by reason of this act or anything done by virtue thereof, but shall be vested in the new corporation by virtue of such act of consolidation." Pursuant to this consolidation act, the Hudson River Railroad Company and the New York Central Railroad Company, another New York corporation, entered into a consolidation agreement dated November 1, 1869, under which the two

corporations merged and consolidated into one corporation, the defendant in this action, the New York Central & Hudson River Railroad Company, and the term of the existence of the new corporation is 500 years. This designation of the term of existence of the new consolidated company was made under section 8 of the consolidation act, which made the provisions of the general railroad law of 1850 (Laws 1850, p. 211, c. 140) applicable to the new corporation; the general law referred to prescribing that articles of association of railroad corporations should state "the number of years the same is to continue." I think the effect of the deed of Simpson to the Hudson River Railroad Company was to vest title in the grantee "its successors and assigns forever," as expressly stated in the deed for the purposes of a railroad, "according to the true intent and meaning of the act" incorporating the grantee, and that the true intent and meaning of that act, and of the Legislature which passed it, was not that the land acquired by the corporation should be used for the operation of a railroad for the public convenience for 50 years, and then revert to the original owners. I think the grant was to exist during the corporate existence of the grantee, as long as it should use the land for the purposes for which it was incorporated. The railroad corporation was chartered for 50 years, but subject to the power of the Legislature to extend its corporate existence. The reason for its existence and the grant to it of the right of eminent domain was the public use to which it was devoted. It was obliged to perform certain public functions as a carrier of passengers and freight. If it failed in the performance of that duty or if it abandoned the operation of the railroad, its corporate rights would cease, and Simpson would have his right of re-entry; but the Legislature never intended that the corporate life should come to an end in 1896, by virtue of the words of the charter. On the contrary, the act of 1846 provides that the corporation may purchase and acquire title to lands, not for 50 years, but "in fee," and as to land condemned "during the continuance of the corporation by this or any subsequent act," and when the Legislature in 1869 authorized the formation and continuance of new corporate bodies by consolidation and merger of existing railroads, where the lines of road connected, it again had in mind the public convenience in preventing interruption in transit of passengers and freight, and the maintenance of through routes for passengers and through traffic for freight; the honest conduct of which is so important to the community. By this act the Legislature granted new life to the corporate franchise originally granted, and extended the term. I hesitate in discussing the plaintiffs' contention at such length, save that it was so earnestly urged. I think the question has been settled in accordance with the views above expressed by the Court of Appeals. In Miner v. N. Y. C. & H. R. R. Co., 123 N. Y. 242, 248, 25 N. E. 339, 340, Judge Earl, writing for the court, says:

"Under these acts, the land in question has been continuously used and occupied by the successive railroad companies for railroad purposes. It was taken by condemnation proceedings under the act of 1832, and the claim of the plaintiff is that only its use was taken for 50 years, the chartered life of the Tonawanda Railroad Company, and that at the expiration of that term the use terminated and the land reverted to him as the successor in the title.

The ingenious and vigorous argument of his counsel has failed to convince us that this action [in ejectment] is maintainable."

Judge Earl says, page 249 of 123 N. Y., page 340 of 25 N. E.:

"The land was to be taken for a permanent public use. It could not have been understood or expected that the railroad should be operated for the accommodation of the public for fifty years, and that then, after the necessity for it had been greatly increased, it should disappear. While the life of the corporation was limited to 50 years, it could not have been expected that it should really cease to exist at the end of that period. While the Legislature reserved the right to cut its life short, it also had the power to extend it. It is the experience of mankind that such quasi public corporations never come to an end by mere effluxion of time. A railroad corporation which had, during 50 years, rendered a public service, and properly discharged its corporate functions, would, with the passage of years, become more and more useful and more and more a necessity. Could it have been the legislative intention that at the end of 50 years the lands taken under the act, with the railroad embankment, ties, culverts, bridges, buildings, and other structures, so far as they had become fixtures, should avert to the original owners or their successors in title? Could it have been the intention that, at the end of 50 years any new or reorganized company could use and operate the railroad only by a new appraisal of damages, which might include, and would probably have to include, the value of the land with a complete railroad thereon? It is improbable that the parties who sought the charter, and the Legislature which granted it, intended the results claimed by the plaintiff.

"There is nothing in the act which limits the use to 50 years, or any other term. The corporation could appropriate only such lands as were 'necessary to its own use;' but by this language the estate in the lands appropriated was not necessarily limited to the term of 50 years. The corporation could not appropriate any land not needed for its use. But when it appropriated an easement in land, how long was the easement to endure? The damages were to be assessed for the devotion of the land to railroad purposes, and an easement was to be taken for such purposes; and that easement was to be paid for by the corporation, and to become its property. Such property it could by authority of law sell, lease, or mortgage, as it could its other property, and the easement would continue, so long as it was needed for the purposes of the railroad by whomsoever owned, for which it was appropriated. The Legislature reserved the right to alter or modify the charter, and thus the life of the corporation could be extended. In such an event was it intended that there should be a new appropriation of the land, and a new appraisal of damages greatly enhanced by the construction of the railroad before the same railroad company, with its extended charter, could operate its road? By section 28 of the act, the people of the state were authorized, by making certain payments, to take this road, when it, with all its fixtures and appurtenances, should 'vest in and become the property of the people of this state.' It certainly was not contemplated that the people should make the payments, and then obtain a title limited by years, which would inevitably pass away from them at the end of the 50 years. Was it within the legislative contemplation that the people would be obliged, in order to operate the road in the public interest, to again appropriate the land with a complete railroad thereon, and thus again pay for the railroad?

"We are thus brought to the conclusion that the Legislature did not intend, in the act of 1832, to limit to the term of 50 years the easements acquired in lands thereunder, and that such easements, by the successive consolidation acts and agreements, became vested in the defendant. There is nothing in the claim of the plaintiff that the damages of the landowner were appraised upon the assumption that an easement for 50 years only was taken. It is believed that a possible reverter of the land is never contemplated in the assessment of damage in such cases, and that the appropriation is regarded as permanent, and the damages are awarded upon that basis. Wood's Railway Law, 767; T. & B. R. R. Co. v. Lee, 13 Barb. 169; C. & N. F. R. R. Co. v. Payne, 16 Barb. 273; In re U. V. & J. R. R. Co., 53 Barb. 457; In re

U., C. & S. V. R. R. Co., 56 Barb. 456; In re N. Y. C. & H. R. R. R., Co., 6 Hun, 149; In re P. P. & C. I. R. R. Co., 13 Hun, 345. No other basis would be practicable, as the chartered life of the corporation might be curtailed or prolonged, and a possible or distant reverter could not well be taken into the account in the estimate of damages. If, therefore, this action could prevail, a landowner might receive and enjoy the full value of his land damages for 50 years, and, at the end of that time, have his land again enhanced in value by a railroad thereon." ·

I conclude, therefore, that the deed from Simpson to the 'Hudson River Railroad Company vests title to the premises described therein, in the defendant during its corporate existence, as long as it shall use the land for the purposes for which it was granted. If I am right in my interpretation of the effect of the deed, and of the consolidation agreement, it follows, that plaintiffs' claim, that the present corporation is limited to the use of three tracks, cannot be sustained. The consolidated corporation possesses all the property and franchises of the constituent corporations, but in addition, it possesses the general powers of railroad corporations (Consolidation Act 1869, Laws 1869, p. 2403, c. 917, § 8; General Railroad Act 1850, supra), which are not limited to use of three tracks.

The plaintiffs claim that a large part of the 66-foot strip granted by Simpson to the Hudson River Railroad Company in 1847 was outside high-water mark; that the title to such part of this land was in the state. But even conceding, for the purpose of discussing the question, that the plaintiffs have succeeded to Simpson's rights in this regard, I do not see how they can assert this claim. When Simpson granted the 66-foot strip lying between his upland and the Hudson river, for the purpose of a railroad, his riparian rights were cut down and diminished to the extent necessary for such operation. He cannot question his grantee's right to use the land which he granted to it for valuable consideration. Saunders v. N. Y. C. & H. R. R. Co., 144 N. Y. 75, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729. If the state objects, it may assert its claim; but it appears in evidence that when Mr. Colgate, the plaintiffs'·predecessor in title, in the year 1871, obtained a grant of the land under water in front of his property at this point, it was made subject to "the rights and privileges in and to said premises or any part thereof which the New York Central & Hudson River Railroad Company may have acquired·under the charter of the Hudson River Railroad Company."

The conceded trespass of four feet by the riprap wall and the toolhouse, and the trespass by filling in outside the strip at the north end of the property, for the purposes of a switch, do not justify a mandatory injunction, directing the removal of the encroachments. It is not claimed that defendant is increasing the encroachment, or going on with the trespass. These encroachments existed before the suit was commenced, and defendant has suspended operations on the filling in for the switch track, and has commenced condemnation proceedings to acquire the land. If these proceedings are prosecuted diligently, the plaintiffs will receive compensation for the land taken, and will thus obtain a legal remedy obviating the necessity for a mandatory injunction, directing the removal of the structures already in place. I

do not think a court of equity should interfere under such conditions. Plaintiffs may have a provision in the judgment that, if the condemnation proceedings are not properly and diligently pressed to completion, application may be made at the foot of the decree for further relief.

In the second cause of action set forth in the complaint, the plaintiffs complain that the defendant so operates its railroad on the right of way adjoining plaintiffs' lands as to constitute a nuisance; and they pray for an injunction restraining such operation. Plaintiffs particularly complain of what they claim to be unnecessary whistles and bell ringing, and the stalling of live stock trains on the tracks adjoining their property with resulting sickening and offensive odors from the cattle and hogs in the cars, and disturbing noises, at all hours of the day and night, interfering with sleep, and the reasonable enjoyment of their property. While the welfare of the public and the necessities of travel require that abutters on a busy railroad must submit to annoyances caused by the reasonable use of the railroad, they are not obliged to submit to those caused by an unreasonable use; all the circumstances being taken into account. Garvey v. L. I. R. R. Co., 159 N. Y. 323, 54 N. E. 57, 70 Am. St. Rep. 550. The railroad law, and the defendants' right to operate its railroad, do not authorize unnecessary and unreasonable acts, amounting to a partial appropriation of property without requiring compensation. "When the Legislature authorizes a thing to be done, which can fairly be accomplished without causing a nuisance, it will be assumed that the Legislature intends that it shall be done in that way." Randolph Em. Dom. § 140. And where the injuries complained of are not the natural or unavoidable result of the exercise of the statutory authority, they are outside the line of legislative protection, and the injured party has the right to resort to a court of equity for injunctive relief. Garvey Case, supra; Cogswell v. N. Y., N. H. & H. R. R. Co., 103 N. Y. 10, 8 N. E. 537, 57 Am. Rep. 701; Morton v. Mayor, etc., 140 N. Y. 207, 35 N. E. 490, 22 L. R. A. 241; Baltimore & Potomac R. R. Co. v. Fifth Baptist Church, 108 U. S. 317–328, 2 Sup. Ct. 719, 27 L. Ed. 739.

A railroad corporation is not exempt from the obligation to so use its property as not to unnecessarily and unreasonably injure its neighbors. Doubtless many inconveniences necessarily result from proximity to a steam railroad, and, as to these, the adjoining owner has no redress. But railroad corporations are bound, as well as private owners, to have regard for existing conditions, the locality of the railroad, the inconveniences arising to their neighbors from their operation; and there is nothing in the charter of a railroad company absolving it from the duty to exercise care, and, when practicable, to minimize these inconveniences, so as to avoid unnecessary injury to those dwelling along the route. By appropriate rules and regulations for the government of its employés, and the enforcement of these rules, by observation of the character of the surrounding locality, and by having in mind the rights of others, and devoting some attention to these matters, a great deal of the unnecessary and unreasonable injuries sometimes attendant on railroad operation can be avoided to the mutual benefit of the parties.

In the case at bar the method of operating the trains, especially those loaded with live stock, to my mind, constitutes a nuisance.

The locality is the city of Yonkers. The neighborhood is entirely residential, and the photographs introduced in evidence by defendant, while affording an admirable view of the railroad tracks north and south, and the fringe of trees along the east line of the railroad strip, do not show much of the city or the plaintiffs' property lying east of the trees. The noise of the cattle on the stalled stock trains, the offensive smells during the day and night, during the long periods when trains are held up on the middle freight track, pass through this ornamental border of trees shown on the photographs, and enter the dwellings on plaintiffs' land and the homes of the residents in the vicinity destroying sleep, causing nausea, and disturbing the comfort of the locality. According to the evidence here, this is not temporary, it is the regular method in which defendant transacts its business. The evidence shows observation by witnesses who went there for the purpose, a week at a time at different seasons. This third track, on which the greatest nuisance occurs, is used by freight and live stock trains coming from the north, down to a point near the south boundary of plaintiffs' land. At this point there is a switch on which the trains pass to the main tracks. There is a switch tower, and under defendant's method of doing business within the city limits, and, in this residential locality, it is conceded that the engineers sound the whistles on their locomotives to attract the attention of the tower men, and, as was proved on the trial, and, as defendant admits in its brief, the whistles and the bell are sounded "to call the attention of the tower men to their presence and desire to get out on the main track." Why it should be necessary to discommode the peace and quiet of the neighborhood to call the attention of the tower men to the train is unapparent. In a city, in a neighborhood such as this, it would appear that the tower men should be on the watch for the train, rendering this much of the noise unnecessary. Another practice proved on the trial, and conceded in the brief of defendant to be according to its rules, is that, when a passenger train is moving in two sections, the first section must signal a freight train standing on a siding, waiting to be let in on the main track, by one long and two short blasts of the whistle (Rule 14 defts.' Exhibit E. S. M. p. 97); the engineer of the freight train responding by two short blasts to indicate his understanding that he must wait until the second section has passed. This, defendant claims, is necessary to avoid mistakes by the tower man who might not notice the signals carried on the train. This is in a city, and in a locality concededly appropriated to residences. I think with watchmen, block systems, telephone and telegraphic communications, and due regard to the rights of others, a large part of this whistling and bell ringing should be avoided. What may be unobjectionable in a legal sense in one locality may be a legal nuisance in another. This method of whistling and bell ringing to attract the attention of one set of employés to the presence and movements of another set of employés, would hardly be tolerated in the neighborhood of defendant's terminal in Manhattan Borough, and at various other settled localities along its line, and yet

the presence and movement of trains are observed without any such signals. Whistles and bells designed to warn persons crossing the tracks, or upon the right of way of the approach of trains, are enjoined by statute. These are not the whistles or bells of which plaintiffs complain; if they were the court would not interfere.

The nuisance complained of, and established by the evidence, is the intolerable system of signaling by whistles and bells going on between the employés day and night, in disregard of the plaintiffs' rights. Nor can it be said that the necessity for the continuous method of operating freight and stock trains, so that they are stalled for long periods of time alongside plaintiffs' property has been established. Granting that conditions are congested below Spuyten Duyvil, this affords no excuse for establishing a terminal for cattle and hogs at Glenwood. The necessity for expediting the movement of passenger trains, the prior right of the great through expresses to a clear way, their importance to the community, all may be conceded; but these considerations, to my mind, are no answer to the plaintiffs' case and to the practically undisputed evidence. It is not for the court to suggest or point out methods; but whether, by rearranging the schedules of these live stock trains, or holding them up at more sparsely settled localities, or by the acquiring of additional track facilities, some change should be made by which the plaintiffs shall be relieved of the undue burden put upon them. Their property cannot be selected to bear the entire burden without compensation. Bates v. Holbrook, 171 N. Y. 460, 64 N. E. 181.

There should be judgment for the plaintiffs, enjoining the sounding of whistles and bells, and the operation of live stock cars in the defendant's track adjoining plaintiffs' premises, in the city of Yonkers, in such a manner as to constitute a nuisance, with costs.

Prepare findings and decree, in accordance with the views herein expressed, and settle on notice.